UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CIVIL ACTION NO. _____

---

ANTHONY R. CALASCIONE,                    |

Plaintiff,                                |

                                          | CIVIL ACTION

                                          | COMPLAINT AND JURY DEMAND

v.                                        |

RUTGERS UNIVERSITY LAW SCHOOL, VICTORIA   |

CHASE, PATRICK SEVERE, AMY BRAUNSTEIN,    |

JOHN DOES 1-5, ALL IN THEIR INDIVIDUAL    |

AND OFFICIAL CAPACITIES,                  |

Defendants,                               |

---

Anthony R. Calascione

3309 Jessica Circle,

Freehold, NJ 07728

(732) 865-6082

anthony@rhinostreet.com

Plaintiff pro se

PRELIMINARY STATEMENT

1.  This is a civil action to vindicate the fundamental due-process rights of Anthony R.

    Calascione, whose domestic-violence proceedings in the Monmouth County Superior Court

    were corrupted by a covert collaboration between Rutgers University Law School's legal

    clinic and members of the state judiciary. Plaintiff was the de facto defendant in a Final

    Restraining Order ("FRO") case where his estranged wife, already represented by two

    private attorneys, Brian Goldenfarb (her FV counsel and the Monmouth Family Unit's de

    facto domestic-violence public defender) and Deyanira Roque (her FM counsel), was

    nevertheless accepted as a "client" of Rutgers Law School's Domestic Violence Clinic /

    Rutgers Law Associates program. Even months after Judge Teresa Kondrup-Coyle issued the

    FRO in November 2023, Mr. Goldenfarb continued to appear and was awarded additional

    counsel fees by Judge Kerry Ellen Higgins, the same judge who, at Judge Coyle's direction

    (as captured on the courtroom audio record), ordered a psychiatric evaluation and "risk

    assessment" of Plaintiff. Despite this existing representation, Rutgers Law entered the case in

    December 2023 and has remained counsel of record for the plaintiff for more than twenty-

    three months, during which she has simultaneously maintained private attorneys in both

    dockets, as well as representation by the Monmouth County Prosecutor's Office in a related

    FO matter, the same office where Judge Coyle formerly served and where her brother is

    currently employed. Notably, the street on which the Prosecutor's Office is located bears

    Judge Coyle's maiden name, Kondrup Lane, emblematic of the close institutional and

    familial ties permeating this network.

2. Acting under color of state law and in concert with Judge Teresa Kondrup-Coyle and Judge Albert J. Rescinio, Defendants engineered a predetermined outcome that deprived Plaintiff of a fair hearing in violation of the Fourteenth Amendment and New Jersey law. The misconduct reached its apex during the 2025 remand proceedings, when Rutgers Law's clinic filed an amended domestic-violence complaint on August 20, 2025, but Judge Rescinio's chambers served Plaintiff with the wrong TRO altogether, a stale October 2023 version that contained the earlier fabricated amendments advanced under former counsel Brian Goldenfarb. Thus, Plaintiff was "served" in form but not in substance: the service created the façade of compliance while concealing the operative pleading that would later anchor the court's findings.

3. Within days, Rutgers privately contacted the court to "cure" the record. On August 26, 2025, the docket was quietly corrected to reflect the newly filed amended TRO, an action documented in Rutgers Law's own certification of services. Yet neither the court nor Rutgers ever re-served Plaintiff with the corrected pleading. By design, the defendants had "checked the box" of service while covertly substituting the true complaint into the file. This was not a clerical error; it was a calculated ruse, a coordinated act of fraud, evidence tampering, and obstruction of justice intended to ensure Plaintiff would remain unaware of the new allegations until after the trial had concluded.

4. Although the Appellate Division had expressly ordered that a different judge preside on remand to guarantee impartiality, the matter was reassigned to Judge Rescinio, a newly sworn-in jurist (May 2024) whose first case assignment was Plaintiff's own. His appointment, expedited by Governor Murphy to replace Hon. Angela Dalton, immediately

placed him under the tutelage of Presiding Judge Coyle, who was seated beside him at his investiture as the head of the Family and Domestic-Violence Unit. Thereafter, Judge Rescinio repeatedly retained jurisdiction over Plaintiff's dockets, even clawing the case back after reassignment, and consistently ruled in ways that mirrored Judge Coyle's prior determinations. Through this continuity of influence, Rutgers Law's clinic became the conduit through which Judge Coyle's directives and loyalties persisted, ensuring the FRO would be reinstated regardless of the evidence. The scheme exemplifies how Defendants exploited Judge Coyle's long-standing Rutgers affiliations, her alma mater, her law clerks, her son's alumni status, and her supervision of Rutgers' Monmouth Family-Court externship program, to entrench institutional bias and punish the innocent defendant rather than correct judicial misconduct.

5. Plaintiff brings this action under 42 U.S.C. § 1983 for violation of procedural due process and for conspiracy to deprive civil rights (under the doctrine of Dennis v. Sparks, 449 U.S. 24 (1980)), including Monell claims against Rutgers Law School for its failure to supervise its clinic attorneys and its custom of litigation misconduct. Plaintiff also brings supplemental state-law claims for abuse of process, fraudulent concealment of evidence, negligent supervision, civil conspiracy, intentional infliction of emotional distress, and tortious interference with court-ordered parenting time. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief to bar Rutgers Law School from future involvement in cases in the Monmouth County vicinage, an extraordinary remedy warranted by the pattern of collusion and due process violations detailed herein. Plaintiff demands a

trial by jury on all claims so triable, and, given the egregious and deliberate nature of

Defendants' conduct, has no interest in any early settlement short of full accountability.

**JURISDICTION AND VENUE**

6. Jurisdiction. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 28

U.S.C. § 1343 because Plaintiff asserts claims arising under the Constitution and laws of the

United States (42 U.S.C. § 1983). The Court has supplemental jurisdiction over the related

New Jersey state-law claims pursuant to 28 U.S.C. § 1367, as those claims form part of the

same case or controversy as the federal claims.

7. Venue. Venue is proper in the District of New Jersey under 28 U.S.C. § 1391(b) because all

Defendants reside in New Jersey and/or are entities or employees of entities located in New

Jersey, and because a substantial part of the events or omissions giving rise to the claims

occurred in New Jersey (specifically, Monmouth County). The specific family court

proceedings at issue were heard in Monmouth County, New Jersey, and the Rutgers Law

School program involved (Domestic Violence Clinic/Rutgers Law Associates) operates in

New Jersey.

8. Intrajurisdictional Assignment. Pursuant to Local Civil Rule 40.1(c), this case is related to

events in Monmouth County, but for an impartial adjudication free from the influence of the

involved state judiciary, Plaintiff requests assignment to a vicinage outside of Monmouth

County if feasible. (This paragraph is not intended to waive venue in this Court, but to

ensure fairness in assignment.)

**PARTIES**

9.  Plaintiff Anthony R. Calascione is a natural person and a citizen of the United States. He is currently a resident of the State of North Jersey (Freehold, NY), and at all times relevant to this Complaint he was a resident of New Jersey and a party to proceedings in the New Jersey Superior Court, Monmouth County (Family Part). Plaintiff was the defendant in the underlying domestic violence matter (docket FV-13-000493-24) and is the appellant in the related New Jersey Appellate Division matter (A-0949-23). He proceeds here pro se. Plaintiff is the father of two minor children who were affected by the outcome of the FRO proceedings.

10. Defendant Rutgers University Law School (hereinafter "Rutgers Law" or "Rutgers Law School") is a public law school and an arm of Rutgers, the State University of New Jersey, with campuses in Camden and Newark, New Jersey. Through its clinics and affiliated programs, Rutgers Law regularly provides legal representation in New Jersey courts. Relevant here, Rutgers Law operates a Domestic Violence Clinic (based in Camden) and a post-graduate fellowship program known as Rutgers Law Associates (RLA), through which law students and recent graduates handle domestic violence cases (including restraining order hearings and appeals) under supervision of Rutgers faculty attorneys. At all relevant times, Rutgers Law (including its clinics and RLA program) was acting under color of state law. Rutgers Law School is a state institution, and its clinic personnel were court-approved to appear in the Monmouth County family court as advocates in the domestic violence matter, a role intertwined with the state judicial process. Rutgers Law is sued for Monell liability (as a "person" under 42 U.S.C. § 1983) and for injunctive relief; to the extent

Rutgers Law may claim sovereign status, Plaintiff seeks prospective relief to halt ongoing violations, consistent with Ex-parte Young principles.

11. Defendant Victoria Chase is sued in her individual and official capacities. At all relevant times, Professor Chase was a faculty member and administrator at Rutgers Law School, serving as Clinical Professor and Director of the Domestic Violence Clinic, as well as Associate Dean for Academic Affairs (Camden). Upon information and belief, Defendant Chase oversaw or had supervisory responsibility for the law students and Rutgers Law personnel handling Plaintiff's wife's case, including setting policies for the Clinic's litigation practices. She also oversees a statewide appellate project for domestic violence cases, which is pertinent given the parallel appeal in Plaintiff's matter. Chase is a New Jersey-licensed attorney and at all times acted under color of state law in supervising and directing the clinic's participation in a state court proceeding. She is a "person" under § 1983 and is sued for damages and injunctive relief.

12. Defendant Patrick Severe, Esq. is sued in his individual capacity. At all relevant times, Patrick Severe was an attorney employed by or affiliated with Rutgers Law School, acting as a supervising attorney for the Rutgers Law Associates program or Domestic Violence Clinic. In the subject FRO case, Rutgers Law's filings list Patrick Severe (Attorney ID 273112021) as the "Supervising Attorney" for the law student/graduate appearing for Plaintiff's wife. Upon information and belief, Severe directly oversaw the day-to-day handling of the case by the Rutgers law students or fellows (including Sam Romeo and James Park) and approved or directed the strategic decisions to file amended pleadings and withhold service. Severe is a

New Jersey-licensed attorney and was acting under color of law by supervising a court-approved legal intern in the proceeding. He is sued for damages.

13. Defendant Amy Braunstein, Esq. is sued in her individual capacity. Upon information and belief, Amy Braunstein was at relevant times an attorney associated with Rutgers Law School's domestic violence legal programs (her Rutgers email appears in internal correspondence). She was included in team communications regarding the case and the appeal, suggesting she held a role in supervising or assisting the clinic's representation of Plaintiff's wife. Plaintiff alleges that Braunstein participated in or knew of the decision to conceal the amended TRO and evidence. Like Severe, Braunstein acted under color of state law through her involvement in this court-authorized clinic representation, and she is sued for damages.

14. Defendant John Does 1-5 are fictitiously named defendants representing other supervisory personnel of Rutgers Law School who were involved in the policies or decisions at issue but whose identities are not yet known to Plaintiff. This may include, for example, administrators who authorized Rutgers Law's appearance despite the wife already having private counsel, or individuals who coordinated with the court. Upon discovery of their identities and roles, Plaintiff will seek leave to amend to name them. Each Doe Defendant, once identified, is expected to be a person who acted under color of state law and can be held liable under § 1983 and state law.

15. Non-Party Co-Conspirators: Judges Teresa A. Kondrup-Coyle, Kerry E. Higgins, and Albert J. Rescinio of the New Jersey Superior Court, Family Part, Monmouth Vicinage, are not named as defendants herein due to judicial immunity, but they are central actors in the

alleged conspiracy. Judge Kondrup-Coyle presided over the initial FRO trial and maintained a long-standing affiliation with Rutgers Law School, she is a Rutgers alumna (as is her son), has employed Rutgers law clerks, and routinely authorized Rutgers law students to appear before her through the school's family-court externship program. Judge Higgins succeeded Judge Coyle as the Family-Matter judge and functioned as her surrogate within the FM docket, continuing to advance directives traceable to Judge Coyle, including ordering Plaintiff's court-mandated mental-health evaluation and risk assessment, and referring that assessment to Dr. DeSantis of IEP, a former subordinate of Judge Coyle at Brookdale Community College, whose report was later discredited, sanctioned, and dismissed for professional misconduct. Judge Higgins was eventually removed from the docket and replaced by Judge Angela Dalton, whose then retirement months later created a vacancy that was expeditoously filled by the appointment of Judge Albert J. Rescinio in July of 2024, only two months from being sworn in, at which time Judge Coyle was serving as Presiding Judge of the Family and Domestic-Violence Unit. Judge Rescinio then presided over the appellate remand trial fourteen months later, that reinstated the FRO.

16. The actions of these three judges are recounted solely to provide the factual context for the Defendants' conduct and the overarching conspiracy described under Dennis v. Sparks, 449 U.S. 24 (1980), which holds that private parties who conspire with an immune judge act under color of law and may be sued under § 1983 despite the judge's immunity. At all relevant times, these judges were state officials acting under color of law, and Defendants Chase, Severe, Braunstein, and others knowingly and willfully participated in joint action with them, thereby losing any shield of private status.

## FACTUAL ALLEGATIONS

### Background: The FRO Case and Rutgers Law Clinic's Involvement

17. On or about June 20, 2023, Plaintiff's then-wife, T.K. Calascione (initials used pursuant to state confidentiality rules), contacted the Freehold Township Police Department alleging that Plaintiff had engaged in acts constituting domestic violence and demanding that he be removed from the marital residence. Police officers responded, conducted a full on-scene investigation, and determined that no predicate act of domestic violence had occurred. The officers expressly advised the plaintiff that she could not have her spouse removed absent a court order or a proven offense. No charges were filed.

18. Six days later, on June 26, 2023, notwithstanding the police findings, the plaintiff appeared before the Monmouth County Domestic-Violence Unit and repeated the same unfounded allegations, resulting in the issuance of a Temporary Restraining Order ("TRO") against Defendant. The case was captioned T.K.C. v. A.C., Docket No. FV-13-002066-23, and assigned to Judge Teresa A. Kondrup-Coyle of the Family Part, Monmouth Vicinage. The TRO alleged harassment and other predicate acts under the New Jersey Prevention of Domestic Violence Act (N.J.S.A. 2C:25-17 to -35). At the time, the plaintiff was represented by private counsel, while Defendant Anthony R. Calascione appeared pro se in the FRO matter.

19. A full hearing was held before Judge Coyle between June and August 2023, during which all allegations were found to be unsubstantiated. On August 21, 2023, Judge Coyle dismissed the TRO on all counts, finding no predicate act of domestic violence and no basis for relief under the statute.

20. Less than three weeks later, on September 11, 2023, the plaintiff obtained a second consecutive TRO, again before Judge Coyle, premised on substantially similar and previously rejected claims. After a second round of proceedings, on November 17, 2023, Judge Coyle abruptly reversed her prior findings and entered a Final Restraining Order ("FRO") against Defendant. Plaintiff contends that this reversal was unsupported by the evidence and was the product of bias, procedural irregularities, and suspected ex-parte communications. The rapid progression from a full dismissal on August 21, 2023 to the issuance of a permanent FRO less than ninety days later marked the beginning of the due-process violations that ultimately required appellate intervention.

21. Defendant timely appealed. On July 3, 2025, the New Jersey Appellate Division issued a written opinion vacating the FRO and remanding the matter for a new trial before a different judge, expressly citing the appearance of judicial bias and multiple due-process failures in the prior proceeding. The appellate court emphasized that, on remand, the Family Part must scrupulously ensure procedural fairness by (1) advising the defendant of his right to counsel, (2) affording adequate notice and opportunity to be heard, and (3) assigning the case to a different judge to guarantee impartiality. The decision vacated the FRO, reinstated the TRO pending retrial, and directed that the new hearing be conducted "free from the taint of the earlier proceedings."

22. **Rutgers Law Clinic Enters Appearance.** In the interim (between the initial FRO trial and the appellate decision), Defendant Rutgers Law School became involved as counsel for T.K.C. Plaintiff's wife already had two private attorneys, yet in or about December 2023, Rutgers, through a law student named Samuel L. Romeo (Rutgers Law '23), entered an appearance as

co-counsel for T.K.C. This was formalized by a substitution of attorney filed January 2, 2024, listing "Attorney of Record: RUTGERS LAW SCHOOL - Samuel L. Romeo" for the plaintiff (T.K.C.), thereby replacing her self-represented status or supplementing her private counsel. In other words, Rutgers Law (via a student with a supervised practice license) took on representation of T.K.C. in the FRO matter and in the appeal. Judge Coyle was aware of this change; at a hearing around that time, Judge Coyle inquired about the status of the appeal and acknowledged Rutgers Law's participation. Notably, Judge Coyle herself is a Rutgers alumna, as is her son, and had formerly employed a Rutgers Law graduate as her law clerk, underscoring a close and familiar relationship with the institution now advocating before her. Indeed, Rutgers Law publicly celebrated Mr. Romeo's courtroom work in this period as a success story of its clinic program.

23. Rutgers Law's Role and Motives. By taking on the case, Rutgers Law injected a state actor into a dispute between private parties. The Domestic Violence Clinic/RLA program's mission is to represent victims of domestic violence in restraining order hearings and appeals. The clinic operates in partnership with New Jersey courts to give law students practice experience. Here, however, Plaintiff alleges Rutgers Law's involvement ceased to be a neutral educational endeavor and became entangled in protecting Judge Coyle's prior rulings. Given Judge Coyle's Rutgers connections and the reputational stake in upholding her FRO decision, Rutgers Law and its agents had both the opportunity and incentive to align with the judges to ensure the FRO was re-instated on remand.Internal communications and procedural events establish that Rutgers Law personnel and their judicial collaborators were not merely careless, but willfully defiant of constitutional command. Plaintiff had already

endured nearly two years of appellate litigation in which the New Jersey Appellate Division expressly found that his due-process rights had been violated and directed that the remand be conducted before a different judge to ensure fairness. Yet, rather than heed that mandate, the same network of actors, Rutgers Law, Judge Coyle's successors, and the Monmouth Family Unit, repeated the very misconduct the appellate court had condemned, knowingly and with deliberation. The institutional attitude was not ignorance but impunity: a collective decision that the appellate ruling could be disregarded if the desired outcome were preserved. Rutgers Law's participants viewed Plaintiff not as a litigant entitled to constitutional protection, but as an obstacle to be neutralized in order to vindicate their clinic's reputation and to insulate Judge Coyle's prior judgment from exposure. In defiance of a published appellate warning, the defendants once again engineered a proceeding devoid of the fundamental fairness the Constitution demands, a level of intentional disregard that transformed negligence into calculated wrongdoing.

24. Plaintiff's Pro Se Status and Disadvantages. Throughout this period, Plaintiff Calascione remained pro se (self-represented) in the domestic violence case. He had limited access to legal resources compared to the combined team of two private attorneys plus Rutgers Law clinic staff representing his wife. Despite this, Plaintiff actively sought to assert his rights. He filed motions (e.g., a motion to dismiss the TRO in 2024) and extensive briefs, some of which questioned Judge Coyle's impartiality (even analyzing her potential biases). Indeed, Plaintiff's written submissions apparently made an impression on Judge Coyle, at a February 2024 hearing, she remarked that she had read Plaintiff's brief "a few times," and even expressed confusion "why we are here" given the appellate posture. Tensions were evident:

Plaintiff contends Judge Coyle attempted to "punish" him for pursuing relief, e.g., by threatening a bench warrant over an unrelated enforcement issue when he filed a motion to vacate. Nonetheless, Plaintiff persisted with the appeal, which succeeded in obtaining a remand.

25. Rutgers Law on the Brief in Appellate Court. During the appeal (A-0949-23), Rutgers Law Associates (through student Samuel Romeo) served as counsel for Respondent T.K.C. on the appellate brief. Thus, by the time of remand in mid-2025, Rutgers Law was deeply involved and aware of the appellate court's ruling. The Appellate Division's opinion was not favorable to the wife's prior victory; it not only vacated the FRO but also implied criticism of how the case had been handled, highlighting due process deficiencies. This context set the stage for the remand trial, where Rutgers Law's team would have to retry the case before a new judge under heightened scrutiny for fairness.

**The Remand Trial: Secret Amendments and a "New" Judge with Old Ties**

26. Appellate Mandate for New Judge. A critical element of the Appellate Division's remand order was that the new FRO hearing be conducted before a different judge. This was intended to preserve the appearance and reality of impartiality. Judge Coyle, who had presided over Plaintiff's family court matters (including the FRO and through Judge Higgins, related divorce or custody issues) for over a year, was specifically not to handle the remand. The case was accordingly reassigned to Judge Albert J. Rescinio in 2025.

27. Judge Rescinio's Prior Involvement. Judge Rescinio was ostensibly "new" to the FRO matter, but in reality he was not a stranger to Plaintiff or the overall family situation. Judge Rescinio had been involved in Plaintiff's entire Family Part proceedings (Judge Rescinio was

the FM judge) in the thirteen months leading up to the remand trial. Thus, while he had not

decided the original FRO, he was familiar with Plaintiff and potentially biased by extraneous

knowledge. Moreover, Judge Rescinio and Judge Coyle were colleagues in the same

courthouse. The switch did little to eliminate the Rutgers connections either: Judge Rescinio,

like Judge Coyle, allowed the continued participation of Rutgers Law clinic counsel in his

courtroom. Plaintiff alleges that this judge did not truly function as a fresh, independent fact-

finder, but rather collaborated with Rutgers Law counsel to ensure the outcome (entry of a

new FRO) aligned with the prior judge's result. In effect, the spirit of the appellate mandate

was violated.

28. Rutgers Law's Trial Team on Remand. By the time of remand hearings in August-September

2025, Rutgers Law's team had evolved. Student Sam Romeo (having graduated and

presumably passed the bar) was no longer acting under the student practice rule; instead, a

recent Rutgers Law graduate James Park, J.D. took a lead role. James Park had earned his

J.D. by 2025 and was practicing under a supervised graduate license (NJ Court Rule 1:21-3)

as a member of Rutgers Law Associates. He was explicitly identified in correspondence as

"Ms. Calascione's attorney in the FRO matter". Defendant Patrick Severe served as the

Supervising Attorney for Mr. Park. Emails show that James Park communicated with

Plaintiff regarding scheduling and hearings, using both his Rutgers email and ScarletMail

addresses. Defendant Amy Braunstein and others were cc'd on internal communications and

appellate notices, indicating a continued team effort. Thus, during the remand proceedings,

Plaintiff's wife was represented by Rutgers Law Associates attorney James Park (not yet bar-

admitted), under the supervision of Patrick Severe and possibly with input from Professor

Chase or her designees. They carried out the litigation strategy described below.

29. Conceiving a Plan to Secure a "Win." Knowing that a genuine retrial before an impartial

judge would almost certainly result in the FRO being denied, thereby vindicating Plaintiff

and exposing the improprieties of Judge Coyle's prior ruling, Rutgers Law and its

collaborators devised a plan to fabricate the appearance of continuing danger. Because the

remand was expressly limited to the record as of November 17, 2023, no new evidence or

post-FRO conduct could lawfully be considered. To overcome that barrier, Defendants

manufactured a series of newly-dated "amendments" to the TRO, each purportedly drawn

from the plaintiff's "memory" of prior incidents, and filed them all bearing the same August

2025 date. These additions, never properly served, were inserted to give Judge Albert J.

Rescinio, who simultaneously served as the parties' FM judge, the necessary "tools" to find a

present need for continued protection even though the actual record could not support such a

finding.

30. The contradiction was striking: in one docket, Judge Rescinio was expanding Plaintiff's

overnight parenting time and acknowledging his full compliance with all orders, while in an

parallel FRO docket he was finding Plaintiff to be a continuing threat requiring lifetime

restraint. The only way to reconcile those conflicting outcomes was through the false

narrative supplied by Rutgers Law's unserved, and in fact mis-served, amendments. The

scheme thus had several deliberate components: (a) to augment the record with fabricated

allegations so that the "new" judge could reach the predetermined result; (b) to stage a false

appearance of service by having the court serve Plaintiff with the wrong amended TRO, an

Docusign Envelope ID: 62EA097A-8E17-4F25-A856-582271DG1E5E

outdated October 2023 version, thereby creating a paper trail of compliance while the true

August 2025 amendment remained hidden and uncorrected even after Rutgers privately

"cured" the docket; (c) to maintain the illusion of procedural regularity so the record would

appear legitimate on its face; and (d) to allow the judge to justify the same outcome, issuance

of a new FRO, thereby preserving the appearance that the original decision and its author,

Judge Coyle, had been correct all along. This calculated strategy transformed what was

meant to be a corrective remand into a staged repetition of the very constitutional violations

the Appellate Division had already condemned.

31. Filing of an Amended TRO Complaint (August 2025). On or about August 20, 2025, while

the case was in pre-trial status on remand, Rutgers Law's attorneys prepared and filed an

Amended Temporary Restraining Order (TRO) application on behalf of T.K.C. This

amended TRO added new factual allegations and incidents of alleged domestic violence that

had not been included in the original 2023 complaint. According to billing records later

obtained, Rutgers Law counsel spent mid-August 2025 drafting and refining this amended

TRO: e.g., on 8/15/2025 they "Reviewed Original TRO and Drafted Amendment to TRO"

(0.95 hrs); on 8/16 and 8/17 they updated and finalized the TRO amendment, sent it to the

client for signature via Docusign, and filed the TRO Amendment. They even discussed

drafting an "Additional Amendment to TRO" on 8/18/2025, suggesting multiple rounds of

new allegations were considered. These records corroborate that Defendants affirmatively

sought to change the pleadings on the eve of trial, introducing new accusations for which

Plaintiff had no notice. An "Amended Temporary Restraining Order" dated August 26, 2025

was subsequently entered by the court (presumably signed by a judge to include the new allegations).

32. Mis-Service and Concealment of the Amended TRO. Crucially, although Defendants filed an amended TRO on August 20, 2025, Plaintiff was never properly served with that pleading. Instead, Judge Rescinio's chambers served Plaintiff with the wrong version of the amended TRO, an outdated October 2023 complaint that had already been superseded. This act created a false record of compliance, allowing the docket to reflect that "service" had occurred while the operative August 2025 amendment remained hidden. Six days later, on August 26, 2025, Rutgers Law privately contacted the court to "correct" the filing and ensure that the new amended TRO appeared on the docket, as reflected in its own certification of services. Yet neither Rutgers nor the court ever re-served Plaintiff with the corrected complaint. As a result, Plaintiff was misled to believe that the only allegations at issue were those from 2023, when in fact a set of newly fabricated claims, filed under the same date, had been secretly introduced for the trial judge's consideration.

33. The New Jersey Court Rules require that any amended domestic-violence complaint be personally served upon the defendant with sufficient time to prepare. By mis-serving the outdated version and failing to correct it, Defendants intentionally violated those rules. Plaintiff, acting pro se, prepared for the remand trial under the false assumption that the prior record governed the case, walking into court blind to the new allegations that would later be used against him. In an October 2025 letter to Rutgers attorney James Park, after discovering the fraud, Plaintiff documented this violation, stating: "The August 26, 2025 TRO contains new amendments and allegations that were never served upon me nor disclosed prior to

trial." The mis-service was not inadvertent, it was a deliberate litigation tactic designed to ambush Plaintiff at trial, manufacture an appearance of procedural regularity, and deprive him of any meaningful opportunity to rebut the newly-inserted claims.

34. Concealment During Trial. The remand trial took place in early September 2025, with decision announced on September 16, 2025. Throughout the proceeding, Rutgers Law's counsel and the plaintiff never disclosed on the record that a new amended TRO had been filed or that Plaintiff had been mis-served with the wrong version. Instead, they proceeded as though the matter remained on the 2023 record, while subtly introducing testimony and exhibits drawn from the concealed August 2025 amendment. When Plaintiff objected that incidents occurring after the November 17 2023 remand date could not lawfully be raised, Judge Albert J. Rescinio overruled the objection, stating that amendments were permitted and continuing to hear the evidence. Plaintiff, acting pro se, accepted that correction at face value, unaware that the supposed "amendments" had never been properly served and that the operative pleading in the court file was silently substituted after the fact. (FRO Decision Tr. 52:51 - 53:33, 58:00 - 59:09.)

35. The transcript confirms that the court read directly from those unserved amendments, including paragraphs describing alleged conduct as late as June 2025, sixteen months after the original FRO, when determining that the plaintiff required "continued protection." By doing so, Judge Rescinio relied upon material that, by rule and by the Appellate Division's July 3 2025 remand directive, could not lawfully be considered. The ruling thus rested entirely on evidence Plaintiff had never seen, never been allowed to challenge, and that post-dated the appellate cut-off by more than a year. This sequence of events, mis-service of the

outdated TRO, concealment of the true August 2025 amendment, judicial adoption of those

hidden allegations, and the court's own misstatement of law to a pro se litigant, constitutes a

textbook fraud upon the court and a deliberate replication of the very due-process violations

the appellate tribunal had already condemned.

36. Plaintiff realized that the judge had indeed based his determination in part on the new, unpled

incidents which Plaintiff had no chance to refute. This was a direct contravention of

fundamental due process: "where governmental action seriously injures an individual, and

the reasonableness of the action depends on fact findings, the evidence used to prove the

Government's case must be disclosed to the individual so that he has an opportunity to show

that it is untrue" (emphasis added). Here, evidence and allegations were not disclosed to

Plaintiff, yet were used against him, flouting this principle. Moreover, the usage of these

allegations violated the Appellate Division's mandate, the promise of a fair do-over was

broken when the "new" judge entertained secret evidence that bore Judge Coyle's imprint

(since the amendments originated from her timeframe). In substance if not form, Judge

Coyle's hand was still present in the remand trial, via the pipeline of Rutgers Law's

machinations. The result (issuance of the FRO) was exactly what Judge Coyle had done, now

effectively rubber-stamped by a colleague.

37. Improper Communications and Coordination. Evidence suggests that ex-parte coordination

occurred between Rutgers Law's counsel, the court, and the plaintiff's private attorney,

August Landi, Esq. Mr. Landi currently represents the plaintiff as lead counsel in the

matrimonial action and has done so for more than six months without charging a single

dollar in legal fees, claiming informally that he is "just helping because he was bored." The

coincidence is striking: Mr. Landi formerly shared office space with Judge Albert J. Rescinio when both practiced privately, up until Judge Rescinio's judicial appointment in May 2024, immediately before he was assigned to Plaintiff's case as his first matter on the bench. Mr. Landi's presence thus provides a direct conduit between the presiding judge and the plaintiff's entire network of representation. Compounding the conflict, Mr. Landi has participated in conference calls with multiple civil-case defendants of the plaintiff, blurring the lines between dockets and suggesting a coordinated legal strategy extending beyond any single case.

38. Billing records produced by Rutgers Law corroborate a pattern of off-record coordination. On August 15 2025, Rutgers personnel recorded an "Email chain conversation with Chambers and opposing party," and additional calls or Zoom meetings on August 15 and August 18 involving "client's divorce attorney" and "Chambers." Although the time entries reference the opposing party in passing, the brevity of the entries, mere tenths of an hour, implies that Plaintiff was not fully included in, or even aware of, substantive discussions. Subsequent entries show Rutgers "resending application to amend TRO and replying to emails from Divorce Attorney" and "Zoom meeting with client and her divorce attorney," confirming that Rutgers and Mr. Landi coordinated directly regarding the secret August 2025 TRO amendments. These communications occurred contemporaneously with Rutgers' "private cure" of the docket and the court's failure to re-serve the operative complaint.

39. The result is a triangulated channel of influence: Judge Coyle's pipeline to Judge Rescinio, Judge Rescinio's professional and personal connection to August Landi, and Mr. Landi's coordination with Rutgers Law's legal team. Together they formed an information loop that

effectively excluded Plaintiff, allowing the court and Rutgers to move the amended pleadings through Chambers without his knowledge. Plaintiff will seek discovery of all correspondence among Rutgers Law, Judge Rescinio's staff, and Mr. Landi, including emails, meeting logs, and docket communications, to determine the full extent of these ex-parte interactions. At this stage, the known circumstances already demonstrate that the appearance of impartiality was irreparably compromised and that the coordinated communications directly contributed to the denial of Plaintiff's right to a fair and level hearing.

40. **Exclusion of Exculpatory Evidence (Edited Emails).** Beyond the ambush by unserved amendments, Defendants also manipulated the evidentiary record through selective omission of a critical email exchange between Plaintiff and August Landi, Esq., the plaintiff's divorce attorney and of questionable professional association with Judge Albert J. Rescinio. Rutgers Law introduced into evidence only the first email, dated May 28 2025, in which Plaintiff advised Mr. Landi that he intended to file a civil complaint and forward copies to professional-licensing agencies. Standing alone, that message could be misconstrued as a "threat" or "criminal coercion." What Rutgers Law and Mr. Landi deliberately withheld was the immediate follow-up email, sent May 30 2025 (and re-transmitted June 3 2025) under the subject line "Why This Isn't a Threat." In that second message, Plaintiff explained in plain language that his actions were lawful, non-retaliatory, and motivated solely by the children's welfare and public safety:

41. *"Put simply: if I'm confident your client is mentally fit, I can live with the fact that I helped her 'cut corners' so she could spend time with our children; but if it turns out she deceived*

*me and truly poses a risk, that same shortcutting becomes a serious public-safety and family*

*issue. Accordingly, I'm willing to hold off filing as long as she shows she's acting rationally*

*and consents to the equal-parenting framework New Jersey favors, N.J.S.A. 9:2-4's mandate*

*for 'frequent and continuing contact with both parents' and joint custody whenever feasible."*

42. This single paragraph directly rebuts the very reasoning Judge Rescinio later announced on the record in finding "criminal coercion." In his oral decision, the Judge stated that he "had a hard time grasping" why Plaintiff had not reported his wife's professional misconduct before the separation but did so afterward, concluding that "there is only one reason [Plaintiff] would do that, to harm her, and she needs protection."

43.  The omitted May 30 email contains the exact, lawful explanation Judge Rescinio claimed did not exist: that Plaintiff's reporting decision was contingent upon verified mental stability and driven by safety, not vengeance.

44. By submitting only the May 28 email while concealing its clarifying counterpart, Defendants and Mr. Landi intentionally falsified the evidentiary record. Their omission inverted the meaning of the exchange and manufactured the element of "intent to coerce" where none existed. The deception was material: Judge Rescinio relied on the truncated exhibit to satisfy both prongs of Silver v. Silver. Had the full communication been disclosed, the court's stated rationale could not have survived.

45. Plaintiff, proceeding pro se and unaware that the second email had been withheld, was deprived of the opportunity to correct the record, furthermore, the evidence was only shared the day of the hearing, while defendant was questioning his only witness, "the victim". He discovered the omission only after trial, when comparing his archived correspondence to the

exhibits in evidence. The suppression of the May 30 email constitutes fraudulent concealment and tampering with exculpatory evidence, a deliberate act to mislead the court and to fabricate the very inference of malice that the withheld language expressly disproved. In short, Defendants excised the truth, substituted false context, and in doing so engineered the predicate "coercion" finding that the judge himself admitted he could not otherwise explain.

46. **Outcome of Remand Trial.** On September 16, 2025, Judge Albert J. Rescinio entered a new Final Restraining Order ("FRO") against Plaintiff, again ruling in favor of T.K.C. The judgment did not arise from a fair trial but from a carefully choreographed fraud upon the court. The record shows that Rutgers Law's clinic, acting in concert with Mr. Landi and Judge Rescinio's chambers, manipulated evidence, concealed exculpatory material, and inserted unserved amendments to ensure that the outcome replicated Judge Teresa Kondrup-Coyle's vacated 2023 decision. The proceeding, conducted under the guise of an appellate "clean slate," was in fact a continuation of the same unlawful alliance, this time with the added participation of a state-sponsored law school functioning as the judge's proxy.

47. The FRO issued on September 16 effectively ratified and resurrected the very order the Appellate Division had vacated for bias, mooting any genuine inquiry into the original misconduct. In doing so, Rutgers Law and its co-conspirators violated not only Plaintiff's due-process rights but also the express mandate of the appellate remand, which required a different judge and a scrupulously fair hearing. Instead, the same actors, connected through personal, professional, and institutional ties, re-created the same outcome through deceit. Their collusion was not theoretical: Rutgers filed unserved amendments, withheld the

exculpatory "Why This Isn't a Threat" email, presented a doctored evidentiary record to a judge who shared an office lineage with Landi and whose first judicial assignment was this case, and Judge Rescinio's chambers mis-served Plaintiff by withholding all the newly listed amendments. The verdict was thus predetermined (unknown to "what degree"), its procedural window-dressing designed solely to give the appearance of legitimacy.

48. The resulting FRO is more constitutionally offensive than the one it replaced. It followed a published appellate finding of due-process violation, yet the same misconduct was willfully repeated by a state university's law department acting under color of law. Because the Appellate Division had already addressed the underlying defects, Plaintiff now faces the near-impossible burden of seeking a second appeal on "the same grounds," even though the recurrence of fraud and concealment prevented him from raising those issues contemporaneously. The harm is continuing and severe: the fraudulent FRO restricts Plaintiff's liberty, chills his speech, burdens his Second-Amendment rights, limits his travel, and stigmatizes him as a domestic abuser. Most devastatingly, it has permanently damaged his parental relationship with his young children, limiting contact, reducing parenting time, and branding him with a false narrative of danger created by the defendants' deception.

49. In short, what should have been a remedial proceeding became an institutional cover-up, executed jointly by Rutgers Law, its supervising attorneys, its student advocates, and its judicial affiliates. The September 16, 2025 order stands as the product of collusion, fraud, and willful defiance of an appellate directive, and its continued enforcement constitutes an ongoing deprivation of constitutional and human rights.

50. Ongoing Effects: Endangerment of the Children and Interference with Parenting. The harm flowing from Defendants' conduct extends far beyond the mere reduction of parenting time; it has exposed the children themselves to danger. From the outset of this litigation, Judge Teresa A. Kondrup-Coyle can reasonably be presumed to be aware that the plaintiff-wife, T.K.C., was mentally unwell and suffering from postpartum depression or a related disorder, via reports Plaintiff made in June-July 2023 to case manager Pauline Pusateri-Meo of the Division of Child Protection and Permanency (DCPP) at the Asbury Park office, or a direct disclosure by TKC to the case manager, in an office under Judge Coyle's own supervision as Presiding Judge of the Family and Domestic-Violence Unit. It therefore can be reasonably presumed that either through direct knowledge or official report that Judge Coyle knew T.K.C. had been diagnosed or identified as suffering from postpartum illness, a condition that medical literature recognizes as posing the greatest risk to the safety of infants and young children.

51. Despite that knowledge, Judge Coyle removed the protective parent and forced the children into the custody of their mentally unstable mother, even publicly labelling Plaintiff a "family annihilator" and speculating, on the record, that he would murder his wife and children before taking his own life. The irony, and the tragedy, is that the only parent shown to present a safety risk was the one being shielded by the court. When the appellate court later vacated the FRO and remanded the case, exposure of that error would have been professionally catastrophic for Judge Coyle; judicial immunity would not protect a knowing act of endangerment, and her removal from the bench would have been inevitable. It is no coincidence that Judge Coyle abruptly retired in April 2025, two months before the Appellate

Division's opinion issued, and that Judge Rescinio felt compelled to proclaim on the record that "anyone who thinks Judge Coyle was pushed out is wrong, she retired after a long and successful career." That gratuitous defense speaks volumes.

52. As a result of the fraudulent restraining orders and continuing judicial collusion, Plaintiff was separated from his children for 237 of the first 247 days following the initial TRO, from June 26 2023 through March 6 2024, and did not receive his first overnight parenting time until October 2024, more than fourteen months later. His first weekly overnight since August 2023 occurred only in August 2025, marking a full two-year deprivation of normal parental contact, including the simple act of walking his son to school each morning. During that period, Plaintiff's children were placed exclusively in the care of their mother, the very person suffering from the mental illness that had triggered his original pleas for intervention.

53. By manufacturing and perpetuating the FRO through deceit, Defendants not only severed Plaintiff's lawful relationship with his children but knowingly placed those children in the custody of a parent whose untreated illness posed the most serious risk to them. That outcome was foreseeable, preventable, and the direct product of Defendants' fraud and collusion. Under New Jersey law, such conduct constitutes both custodial interference and an independent tortious interference with parental rights. The emotional devastation inflicted on Plaintiff, and the ongoing danger to his children, represent the gravest and most enduring consequences of Defendants' scheme.

54. Damages Summary. As a direct and proximate result of Defendants' recent and ongoing conduct, Plaintiff has suffered, and continues to suffer, extensive constitutional, emotional, and familial harm. While the underlying deprivation of rights began under the original FRO,

Rutgers University Law School and its agents reignited and perpetuated those injuries through their fraudulent acts and conspiracy in August and September 2025. Their conduct reinstated an unlawful restraining order, preserved the false narrative on which it rested, and ensured the continued separation of Plaintiff from his children. As such, Rutgers and its co-conspirators bear responsibility for the continuing damages now unfolding, including imminent danger to the children placed at risk by the Defendants' actions.

55. Specifically, Plaintiff has sustained and continues to sustain: (a) Violation of his constitutional right to due process, resulting in the unlawful reinstatement of an FRO following a fraudulent remand proceeding; (b) Loss of liberty interests, including restrictions on movement, speech, travel, and fundamental parental rights, as well as enduring reputational stigma from being falsely labeled a domestic abuser; (c) Severe and continuing emotional distress, anxiety, and trauma from years of litigation compounded by Defendants' recent deception, and from the ongoing separation from his children despite full compliance with court orders; (d) Ongoing and worsening danger to his children, who remain in the unsupervised custody of a mentally unstable parent, a condition Defendants have actively concealed and perpetuated through fraud; (e) Diminished relationship with his children and deprivation of meaningful parenting time, some of which is irretrievably lost and the remainder of which remains unlawfully curtailed by the fraudulent FRO; (f) Economic losses, including missed work, diminished professional opportunities, and legal expenses incurred to defend against and correct the Defendants' misconduct; and (g) Pain and suffering, humiliation, and indignity from being targeted and vilified through a coordinated

scheme between a state law school, members of the judiciary, and private counsel, resulting in profound loss of faith in the integrity of the judicial system.

56. These injuries are ongoing and compounding. Each day that the fraudulent FRO remains in effect, Plaintiff's constitutional rights are violated anew, his children remain in potential danger, and the emotional and financial toll deepens. Defendants' actions have transformed prior harm into a continuing wrong, making them jointly and severally liable for all resulting damages, including the current and imminent risks their conduct has created.

57. Punitive Considerations. Defendants' actions were not the result of mistake or negligence; they were deliberate, malicious, and continuing acts of fraud and collusion. The conduct at issue, including the filing and concealment of unserved amendments, the manipulation and mis-service of pleadings, the suppression of exculpatory evidence, and the orchestration of ex-parte communications with the presiding judge through the plaintiff's connected attorney, constitutes an intentional scheme to deceive the court and to perpetuate an unlawful restraining order in defiance of an appellate mandate. These acts were undertaken with full knowledge of their illegality and with a calculated purpose: to protect judicial colleagues, preserve an institution's reputation, and sacrifice the rights and safety of Plaintiff and his children in the process.

58. The wrongdoing is not historical but ongoing. Rutgers University Law School's continued participation in the FRO matter, even after the exposure of these improprieties, represents an active threat to Plaintiff's constitutional rights and to the safety of the children wrongfully placed in harm's way. Such conduct, carried out under color of state law by licensed attorneys, officers of the court, and a publicly funded university, offends the most

fundamental tenets of justice. It reflects a knowing and systemic disregard for law, ethics, and human welfare.

59. Accordingly, Plaintiff seeks punitive damages not only to punish the Defendants for their past and present misconduct, but to deter future abuses of authority by public institutions and legal professionals who believe they can weaponize their positions with impunity. The magnitude of Defendants' deceit, and the life-altering harm it has caused and continues to cause, warrants a punitive award commensurate with the gravity of their offenses and the need to reaffirm that no arm of the State, no matter how credentialed, stands above the law.

60. The following Causes of Action are pleaded without limitation to each other; facts alleged in one count are incorporated into others to the extent applicable. All defendants are put on notice of the claims both collectively and specifically as set forth.

**Count I - 42 U.S.C. § 1983: Violation of Procedural Due Process (Fourteenth Amendment)**

61. Incorporation of Allegations: Plaintiff repeats and incorporates all prior factual allegations. At all relevant times, Defendants acted under color of state law by participating with state judicial officers in the domestic violence proceedings. Plaintiff was entitled to fundamental procedural due process in those proceedings because the liberty interest at stake - his rights in the care and custody of his child - is one of the oldest fundamental rights recognized by law. Due process required, at minimum, that Plaintiff receive notice of any allegations against him and a meaningful opportunity to be heard, which includes the rights to confront adverse evidence and rebut the claims before an impartial tribunal. "[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the

individual so that he has an opportunity to show that it is untrue." In other words, secret evidence and ambush tactics have no place in a fair hearing.

62. Due Process Violations: Defendants deprived Plaintiff of these due process rights through a deliberate scheme of deception and procedural manipulation. They filed an Amended Domestic Violence Complaint in secret and failed to serve it on Plaintiff, ensuring he had no notice of new allegations. They withheld and concealed critical evidence (such as communications and records) that Plaintiff was entitled to review. They misled the court into proceeding as if the new allegations had been disclosed and responded to, when in fact Plaintiff was kept entirely in the dark. As a result, the final restraining order ("FRO") issued on September 16, 2025 was obtained without a fair hearing - Plaintiff never had the chance to hear or refute the evidence that formed the basis of that FRO. This clandestine process violated fundamental principles of due process, rendering the proceeding fundamentally unfair and constitutionally infirm.

63. Resulting Injury: The denial of due process caused concrete harm. Plaintiff was wrongfully subjected to a Final Restraining Order that he "most probably would have defeated had a fair hearing been held". He suffered loss of liberty and reputational stigma by being branded a domestic abuser without proper trial, and this tainted order is now being used to prejudice his position in an upcoming custody trial. Defendants' actions thus violated Plaintiff's Fourteenth Amendment right to a fair proceeding. Plaintiff seeks compensatory damages for the harm caused by this constitutional violation, and any appropriate prospective relief to prevent further such deprivations of due process (as further detailed in Count XI, the claim for injunctive relief).

**Count II - Conspiracy to Violate Civil Rights (42 U.S.C. § 1983)**

64. Incorporation of Allegations: Plaintiff repeats and incorporates all prior paragraphs.

    Defendants Patrick Severe, Victoria Chase, Ellen Braunstein, and Does 1-5 (all Rutgers Law

    clinic personnel) conspired among themselves and with state judicial actors to deprive

    Plaintiff of due process and a fair trial in the domestic violence matter. Beginning by August

    2025 (upon remand of the case), these Defendants reached a mutual understanding and

    agreement with at least Judge Teresa Kondrup-Coyle and Judge Albert Rescinio (or their

    staff) to engineer the entry of an FRO against Plaintiff irrespective of the merits. In other

    words, they agreed to "corrupt the judicial process" and predetermine the outcome against

    Plaintiff.

65. State Action Via Joint Action: Although private parties are generally not liable under §1983,

    here the participation of state judges in the conspiracy satisfies the state action requirement.

    Defendants jointly engaged with these state officials to subvert Plaintiff's rights; therefore,

    all conspirators (even the private actors) acted "under color of" state law for §1983 purposes.

    The judges themselves are immune from damages for their judicial acts, but that judicial

    immunity "does not extend to shield the co-conspirators" who collaborated with them. The

    U.S. Supreme Court in Dennis v. Sparks, for example, held that private persons who conspire

    with a judge to deprive someone's rights are acting under color of law and may be held

    liable, even though the judge is immune. That principle squarely applies here.

66. Overt Acts in Furtherance: In executing their conspiracy, Defendants committed numerous

    overt acts to carry out the unlawful scheme. These acts included: (a) filing the amendment to

    the TRO complaint and deliberately concealing it from Plaintiff, which could not have

occurred without coordination with court staff (to ensure the amended pleading was not served); (b) engaging in off-the-record communications with Judge Rescinio's chambers and Plaintiff's attorney to orchestrate the ambush (the billing records and timing of events suggest clandestine coordination); (c) proceeding at the remand hearing to introduce new allegations and evidence as if Plaintiff had notice, with Judge Rescinio's tacit complicity, thereby creating a seamless trial-by-ambush. Through these concerted actions, Defendants ensured the hearing was a mere formality - a predetermined FRO "win" for their client, not a genuine adversarial proceeding.

67. Agreement and Role of Each Conspirator: Each named Defendant played a knowing role in this plan. Defendant Severe (the clinic supervising attorney) oversaw and approved the strategy to withhold service of the amended complaint and likely coordinated with court personnel behind the scenes. Defendant Chase (clinic director/professor) fostered an environment that prioritized winning over ethics and gave implicit (if not explicit) approval to the tactics, given her position of authority (and her prior public emphasis on the clinic's success). Defendant Braunstein (student or fellow) and others executed the plan by preparing the new allegations and going along with the non-service and evidence concealment, relying on the judges' cooperation. Judge Kondrup-Coyle (who had been reversed on appeal) had a motive to assist Rutgers in "fixing" the loss on remand, and Judge Rescinio (who presided on remand) - notably, just last year, shared office space with Plaintiff's ex-wife's attorney - accommodated the presentation of undisclosed evidence and overruled Plaintiff's objections to it. In sum, all conspirators were aligned in purpose: to ensure an FRO would issue against Plaintiff by bending or breaking the rules as needed.

68. **Liability Under §1983:** This joint conduct violated §1983. Private persons who willfully participate in a joint scheme with state officials to deprive someone of constitutional rights are liable under §1983. The conspiracy here resulted in the very deprivation alleged in Count I: Plaintiff's loss of due process and an unfair imposition of an FRO. But for Defendants' coordinated wrongdoing, Plaintiff's hearing would have been conducted fairly and no FRO would have been entered on the scant merits. All Defendants in this Count are therefore jointly liable for the civil rights conspiracy. Plaintiff seeks compensatory damages against these Defendants for the violations of his rights, as well as attorneys' fees and costs under 42 U.S.C. §1988 (should he prevail). Punitive damages are also warranted against the individual conspirators given the intentional, egregious nature of their misconduct. (The judges are not sued for damages due to immunity, but the conspirators are not shielded by that immunity.) This cause of action thus vindicates the principle that no one - not even clinic attorneys or private parties - may conspire with state judges to trample a litigant's civil rights with impunity.

**Count III - Monell Liability (42 U.S.C. § 1983) - Institutional Liability of Rutgers Law (Unconstitutional Policy, Custom, or Failure to Train/Supervise)**

69. **Parties and Capacity:** This count is brought against Defendant Rutgers University Law School ("Rutgers Law") - specifically its Domestic Violence Clinic program - and against the responsible Rutgers officials in their official capacities (to the extent needed for full injunctive relief). All factual allegations are incorporated here by reference.

70. **Municipal/Institutional "Person" Liability:** Although Rutgers University is a state institution, Rutgers Law School's operation of a litigation clinic in state courts is treated analogously to

Docusign Envelope ID: 62EA097A-8E17-4F25-A856-582271DC1E5E

a municipal or local government entity for §1983 purposes in this context. Under Monell v.

Department of Social Services, 436 U.S. 658 (1978), local government bodies and their

subdivisions are "persons" who can be sued under §1983 when official policies or well-

settled customs cause a constitutional violation. A government entity may not be held liable

on a mere respondeat superior (vicarious liability) theory. Instead, liability attaches only if

the entity's policy, practice, or failure to train was the "moving force" behind the

constitutional injury. Here, Rutgers Law (through its Domestic Violence Clinic) functioned

as a state actor carrying out a public function in court, and it can be held liable under Monell

principles to the same extent as a municipality would.

71. Rutgers Law's Policy or Custom: The constitutional violations described in Counts I and II -

the denial of due process via secret filings, evidence suppression, and collusion with judges -

were not isolated acts by rogue individuals. They were products of Rutgers Law's policies,

customs, or systemic failures. On information and belief, Rutgers Law School, through its

Domestic Violence Clinic, maintained an unofficial policy or culture that prioritized winning

cases over ethical compliance and due process. The involvement of multiple clinic personnel

(students, supervising attorneys, and perhaps faculty advisors) in the scheme suggests an

institutional culture that tolerated or encouraged "sharp practices." For example, if the clinic

leadership measured success by securing FROs and touted those victories in publicity, it may

have incentivized aggressive tactics at the expense of fairness. Notably, this case was a

retrial after the clinic's initial victory was reversed for due process violations - a red flag that

should have prompted introspection. Yet Rutgers Law allowed the same or worse misconduct

on remand, implying an institutional acquiescence (or deliberate indifference) to such

behavior. In short, Rutgers Law either explicitly or implicitly encouraged its clinic members to "win at any cost," or at minimum failed to discourage or train against the kind of due process violations that occurred.

72. Failure to Train and Supervise: Rutgers Law's liability also arises from its failure to adequately train or supervise the clinic staff and students in their legal and ethical obligations. A §1983 claim lies where a failure to train amounts to deliberate indifference to the rights of persons with whom the clinic would come into contact. Here, despite operating a clinic that regularly litigates in sensitive matters (domestic violence cases affecting fundamental rights), Rutgers provided grossly insufficient training/guidance on obeying court rules (like service requirements), disclosure of evidence, and basic due process. The Appellate Division had explicitly found a due process violation in the first FRO trial (in July 2025), putting Rutgers on notice that its clinic's practices were problematic. Any reasonably careful institution, after such a rebuke, would retrain and closely supervise its clinic on remand to ensure compliance with due process. Rutgers Law did not. It failed to intervene or institute safeguards, effectively allowing the clinic team to repeat and even escalate the misconduct. This lack of oversight was tantamount to official approval of the unconstitutional tactics, or at least deliberate indifference to the risk of such tactics. Rutgers Law's decision-makers (clinic directors and law school administration) either knew or should have known that without corrective training, there was a high likelihood of due process violations - especially given the clinic's high-pressure environment and the prior appellate warning. Yet Rutgers did nothing meaningful. This failure to train and supervise was a

proximate cause of Plaintiff's injuries: it was Rutgers Law's institutional lapse that set the stage for its agents to violate Plaintiff's rights on remand.

73. Monell Causation and Liability: By reason of the foregoing, Rutgers Law School (as an institution) bears §1983 liability for the constitutional injury inflicted on Plaintiff. The injury - Plaintiff's loss of due process and the resulting unjust FRO - was caused by Rutgers Law's policies or customs and its deliberate indifference in training/supervising its clinic personnel. In Monell's terms, the "moving force" behind the violation was not just the individual defendants, but the Rutgers clinic's institutional norms and failures. Rutgers Law cannot escape responsibility by pointing to the individual bad acts of its employees if those acts were made possible by an institutional policy (or lack thereof). Here, the clinic's entire chain of command was involved or willfully blind. Accordingly, Rutgers Law is liable under §1983. Relief: Plaintiff primarily seeks prospective equitable relief against Rutgers Law under this Count (such as declaratory and injunctive measures - see Count XI) to reform the clinic's practices and prevent future violations. To the extent monetary damages are sought, Plaintiff limits those to non-barred forms (for example, if any exception to sovereign immunity applies or if individual capacity claims against policymakers can be maintained). Plaintiff acknowledges that Rutgers, as an arm of the State of New Jersey, may claim Eleventh Amendment immunity from damages; thus the focus is on holding Rutgers accountable via declaratory/injunctive orders (Ex-parte Young-style relief) for its role in the constitutional deprivations. In any event, Rutgers Law's compliance with constitutional standards can and should be compelled by this Court, given the pattern of misconduct established.

(Note: In addition to Rutgers Law itself, Plaintiff pleads that Defendants Chase and Severe - as the clinic supervisors/policymakers - are liable in their official capacities for the Monell claim. This is essentially the means to obtain injunctive relief against the institution through its officers. Any reference to Rutgers Law in this Count should be read to include those official-capacity defendants as appropriate.)

**Count IV - Malicious Abuse of Process (New Jersey Common Law)**

74. Incorporation of Allegations: Plaintiff repeats and incorporates all preceding paragraphs. This Count is against Defendants Severe, Braunstein, Chase, and Does 1-5 in their individual capacities for the tort of malicious abuse of process under New Jersey law.

75. Elements of Abuse of Process: Under New Jersey law, abuse of process is the misuse or perversion of legal process after it has been issued, for an end other than that which the process was designed to accomplish. It differs from malicious prosecution (also called malicious use of process), which involves wrongfully initiating a proceeding without probable cause. By contrast, abuse of process lies in using legal process in a manner "not contemplated by law" - typically, there must be some further act after the process's issuance that demonstrates an ulterior motive. In short, even if a lawsuit or proceeding was properly initiated, a defendant commits abuse of process by employing the court's procedures for some improper, collateral purpose (usually to coerce or oppress the plaintiff) rather than to adjudicate the claim legitimately. New Jersey courts have long required proof of (1) an ulterior motive and (2) a further act after issuance of process that perverts the process to that motive. As the Appellate Division explained (quoting the Court of Errors & Appeals), "the malicious abuse is the employment of a process in a manner not contemplated by law", and

"process has not been abused unless after its issuance the defendant reveals an ulterior purpose… by committing further acts whereby he uses the process as a means to coerce or oppress the plaintiff." (emphasis added). In other words, the mere filing of a lawsuit, even with bad intent, is not abuse of process - there must be an improper act in the use of process after it is issued. New Jersey law is clear that "in the absence of some coercive or illegitimate use of the judicial process, there can be no claim for its abuse."

76. "Process" at Issue: The legal process involved here was the Domestic Violence Restraining Order proceeding itself - specifically, the Temporary Restraining Order (TRO) obtained against Plaintiff in June 2023 and the subsequent Final Restraining Order (FRO) trial on remand in 2025. Once the TRO had been issued by the court (initiating the DV case), the matter was in the judicial pipeline awaiting a final hearing. That TRO and the pending FRO trial constituted the "process" which Defendants then abused. By August-September 2025, that process was well underway (indeed, on remand from an appeal), and Defendants had the TRO/FRO proceeding in their hands as a tool they could misuse. Importantly, the FRO hearing process is intended to fairly determine whether a final restraining order is warranted based on the evidence and allegations known to both parties. It is not intended to be a stealth mechanism to ambush one side.

77. Ulterior Motive and Misuse: Defendants acted with an ulterior purpose unrelated to adjudicating the domestic violence claims on their merits. Their motive was to secure an FRO at all costs - in part to salvage Rutgers Law's pride after losing on appeal, to enhance the clinic's reputation, and to give their client tactical advantage in the parallel custody dispute. To achieve this improper end, Defendants misused the judicial process in a manner it

was never intended: they covertly amended the TRO complaint and never served Plaintiff, ensuring he would walk into the FRO trial completely unprepared and unable to defend against the new allegations. They also concealed evidence (communications with the court and opposing counsel) and sprung new "evidence" at trial without disclosure, all the while invoking the formal process of a trial to give an appearance of legitimacy. These are classic "further acts" after process issuance that demonstrate coercive misuse: Defendants turned what should have been a fair hearing into a trap, using the court's subpoena and trial procedures not to seek truth, but to secure a predetermined outcome by ambushing Plaintiff. Essentially, they converted the restraining order process - meant to protect against genuine abuse - into a weapon to harm Plaintiff's rights and to "tie his hands" from mounting a defense.

78. To illustrate, New Jersey case law provides examples of abuse of process: in Tedards v. Auty, an attorney obtained a writ of ne exeat (a process) and then misrepresented facts to the judge to have the plaintiff arrested and coerced into posting a bond, thus perverting the purpose of that writ. The court deemed those post-issuance misuses - the lies to the judge to achieve a collateral aim - to constitute an abuse of process. Here, similarly, Defendants misused the TRO/FRO process by arranging for Plaintiff to be blindsided at the hearing so that an FRO would issue by default. They leveraged the formal trial setting to introduce secret allegations, effectively ensuring Plaintiff's defeat "irrespective of the merits". Such conduct - using court procedure as a mere pretext to obtain an outcome through trickery - is a prototypical abuse of process.

79. Improper Purpose: The improper collateral objective here was twofold: (1) to coerce
Plaintiff's capitulation in both the DV and custody matters by saddling him with a restraining
order he couldn't contest, and (2) to protect Rutgers Law's interests (reputation and their
client's litigation position) rather than to resolve the DV allegations justly. The FRO was
obtained not to protect anyone from actual danger - indeed, the Appellate Division had
vacated the earlier FRO and there was no new genuine incident - but to manufacture a record
that Plaintiff was a "continuing threat," thereby prejudicing the upcoming custody trial and
posturing a win for the clinic. In other words, Defendants perverted the DV process into a
strategic tool to influence another proceeding (the family court custody case) and to cover up
the embarrassment of the earlier due process reversal. This ulterior agenda is outside the
legitimate goals of a restraining order hearing and exemplifies a misuse of process "not
contemplated by law."

80. Coercive Acts: Defendants' actions were coercive and oppressive to Plaintiff - he was
effectively tricked into violating court rules (unknowingly, by not responding to an unserved
complaint) and then had an FRO imposed, which carries criminal penalties for any contact
and severe stigma. By obtaining that FRO through deceit, Defendants placed Plaintiff under
a "criminal no-contact regime", severely burdening his ordinary life and parental
communication. They also used the FRO as leverage: the existence of the FRO would coerce
Plaintiff in the custody case (pressuring him to settle under unfavorable terms, since fighting
is now uphill with the FRO in place). All of these "further acts" - secret filing, non-service,
evidence hiding, surprise use of undisclosed evidence - were done after the DV case was
initiated, utilizing the court's processes in an illegitimate way to harm Plaintiff. This satisfies

the tort's requirements: Defendants revealed their ulterior purpose after process issuance by

these overt acts, thereby demonstrably using the process to coerce and oppress Plaintiff.

81. Injury Caused by Abuse of Process: Plaintiff suffered damages as a direct result of

Defendants' abuse of process. The unlawfully obtained FRO immediately placed him under

significant restraints (e.g. inability to freely contact his child or the child's mother, risk of

arrest for technical violations, etc.), and it gravely prejudiced his position in the imminent

custody dispute. He has endured emotional distress, reputational harm, and legal

disadvantages due to an order that was procured through procedural trickery rather than a

fair hearing. Moreover, the abuse of process is ongoing: each day the FRO remains in effect

(until it is vacated or modified by a court) represents a continuing deprivation and harm,

given it was achieved improperly. Plaintiff seeks compensatory damages against the

individual Defendants for this tort, including damages for emotional suffering, reputational

injury, and the expenses of having to undo or mitigate the fraudulent FRO. Punitive damages

are also warranted given Defendants' malicious and outrageous misuse of legal process.

82. New Jersey precedent confirms that such misuse is actionable. See, e.g., Hoffman v.

AsSeenOnTV.com, Inc., 404 N.J. Super. 415, 431 (App. Div. 2009) (reaffirming that

"process is not abused unless after its issuance the defendant reveals an ulterior purpose…

by committing 'further acts' whereby he uses the process as a means to coerce or oppress the

plaintiff."). Defendants' conduct here fits squarely within that definition. Accordingly,

Plaintiff asks the Court to enter judgment in his favor on this Count, finding Defendants

liable for abuse of process under New Jersey law.

**Count V - Fraudulent Concealment of Evidence (Spoliation of Evidence - New Jersey Common Law)**

83. Incorporation of Allegations: Plaintiff incorporates all previous paragraphs. This Count is against Defendants Severe, Braunstein, Chase, and Does 1-5 in their individual capacities for the tort of fraudulent concealment (also known as intentional spoliation of evidence) as recognized in New Jersey.

84. Summary of the Tort: New Jersey's Supreme Court in Rosenblit v. Zimmerman, 166 N.J. 391 (2001), confirmed that a party who intentionally withholds, hides, or destroys evidence crucial to ongoing or pending litigation, with the purpose of disrupting the fair trial of the case, can be held liable in a separate tort action for fraudulent concealment. Unlike mere negligent loss of evidence, this tort addresses deliberate, bad-faith interference with the discovery or presentation of evidence. The elements (as outlined in Rosenblit and subsequent cases) include: (1) the evidence was material to the litigation; (2) the opponent wrongfully withheld, concealed, or destroyed it with intent to disrupt the case; (3) the plaintiff was unable to obtain the evidence elsewhere; (4) the concealment caused the plaintiff to be impaired in his ability to litigate his claim or defense; and (5) damages resulted.

85. New Jersey gives an aggrieved party two avenues upon discovering such spoliation: (a) an in-case remedy (like an adverse inference, discovery sanctions, etc.), and/or (b) a separate lawsuit for damages (if the concealment is discovered too late to be remedied in the original case, or if additional harm was caused). Rosenblit specifically allows a separate tort action for fraudulent concealment when evidence is intentionally hidden or destroyed, as a way to

compensate the victim and to deter such misconduct. The purpose is to penalize egregious discovery abuses and protect the integrity of the judicial process.

86. Defendants' Conduct: In this case, Defendants engaged in fraudulent concealment of evidence in the domestic violence proceeding. They intentionally withheld and failed to disclose material evidence that they had a legal obligation to turn over. Specifically, during the lead-up to the September 2025 FRO hearing on remand:

• Defendants had participated in email chains and meetings (as reflected in Rutgers Law's billing records) involving the court's chambers and Plaintiff's divorce attorney regarding the TRO amendment. These communications and any related correspondence were never disclosed to Plaintiff, despite being directly relevant to the issues in the DV case (service of pleadings, coordination with the court). By hiding these, Defendants prevented Plaintiff from knowing that ex-parte discussions had occurred and from using that information to challenge the fairness of the process.

• Defendants also concealed the very existence of the Amended TRO Complaint until the day of the hearing. This counts as concealment of a document that was required to be served. Essentially, the amended pleading is evidence itself of new allegations. Defendants' failure to serve it (and any related court filings about it) meant Plaintiff was deprived of a critical piece of evidence - namely, knowledge of what claims he had to meet.

• Any notes, drafts, or communications among Defendants and with third parties (like the clinic's client or the judges' staff) about the strategy to not serve Plaintiff, or about "fixing" the record on remand, were likewise material. If such records or communications existed, Defendants had a duty to preserve and disclose them during discovery (if formal discovery had

occurred) or at least not to destroy them. On information and belief, Plaintiff contends that

Defendants likely failed to put any litigation hold in place and may have even destroyed or

failed to record some communications to avoid leaving a paper trail.

87. All these actions amount to intentional suppression of evidence. Defendants knew these

pieces of information were highly material to Plaintiff's ability to contest the FRO. They had

a legal obligation (by court rules, ethical duties of candor, and basic discovery principles) to

disclose the amended complaint and any ex-parte communications or other information that

should be shared with an adversary. By deliberately breaching these obligations, they

ensured Plaintiff remained ignorant of key facts and thus unable to use them in his defense.

88. Their intent in concealing this evidence was clear: it was to frustrate Plaintiff's defense and

ensure their ambush succeeded. If Plaintiff had known of the amended complaint

beforehand, he could have moved to strike it or adjourn the hearing. If he had known of

Rutgers' communications with the court, he could have raised objections to the judge's

impartiality or at least been alerted to the risk. Defendants hid this evidence precisely so that

none of those remedial steps would occur - their goal was to keep Plaintiff disadvantaged

and uninformed, so they could prevail unfairly. This satisfies the intent element: they acted

"with purpose to disrupt" the proceeding to their advantage.

89. Resulting Impairment: Plaintiff was severely impaired in litigating his case due to the

concealment. Unaware of the amended allegations, he came to the FRO hearing preparing to

address only the original complaint's issues - effectively fighting with one hand tied behind

his back. Unaware of off-record communications, he was unable to object to potential bias or

to cross-examine witnesses about those communications (for instance, he could have asked

his ex-wife or the clinic staff whether they discussed the case with the judge's chambers, etc.,
had he known). The concealment thus deprived him of any meaningful opportunity to mount
a defense or expose the collusion. The immediate consequence was that an FRO was entered
against him that likely would not have been, had all evidence been on the table and
procedure followed. Furthermore, because the scheme succeeded in the trial court, Plaintiff
must now undertake burdensome steps (this federal action, and possibly additional state
court motions) to undo the damage - all of which is a direct result of Defendants'
concealment of the truth.

90. Damages: Plaintiff seeks damages for this fraudulent concealment. These include the costs of
additional litigation made necessary by Defendants' conduct (e.g., legal fees, if any, and pro
se litigant out-of-pocket costs, to pursue relief from the tainted FRO), as well as
compensation for the impact on the underlying case (the lost opportunity to fairly contest the
FRO in September 2025). In Rosenblit, the Court recognized that when evidence is hidden or
destroyed, a plaintiff might recover, inter alia, the value of the claim lost or the increase in
costs of litigation caused by the spoliation. Here, Plaintiff's "claim" (or defense, more
accurately) in the DV proceeding was essentially lost due to the concealment. Additionally,
he has suffered emotional distress and humiliation knowing that the process was rigged by
secret evidence. These are recoverable as consequential damages stemming from
Defendants' intentional tort.

91. Finally, punitive damages are warranted to punish and deter this kind of litigation fraud. The
New Jersey Supreme Court noted that one purpose of the tort remedy for spoliation is to
"deter others from such conduct."Defendants' conduct was willful, malicious, and

undermined the integrity of the judicial process; an award of punitive damages would be appropriate to signal that such behavior will not be tolerated.

92. Authority: The recognition of this tort in New Jersey is well-established by Rosenblit v. Zimmerman. In that case, the Supreme Court explicitly held that a litigant may pursue a fraudulent concealment cause of action when an adversary hides or destroys evidence, and it set forth the framework for relief. Subsequent cases have applied Rosenblit to allow relief where, as here, one party's intentional misconduct in discovery or evidence disclosure makes it effectively impossible for the other party to get a fair trial. Plaintiff's allegations fit squarely within the ambit of Rosenblit. Thus, Defendants should be held liable for fraudulent concealment.

(Note: To the extent any of the concealed evidence has since been revealed (for example, if during this federal case or other proceedings Plaintiff obtains what was hidden), that does not erase the tort - the key is that at the time of the original trial, the concealment prejudiced Plaintiff. Indeed, Rosenblit contemplates a post-trial remedy. Plaintiff will identify the specific items of evidence concealed and how their absence affected the DV case, at trial in this matter.)

**Count VIII - Intentional Infliction of Emotional Distress (IIED)**

93. Incorporation of Allegations: Plaintiff incorporates all prior paragraphs (except those relating exclusively to other causes of action) as if set forth here. This Count is pleaded against Defendants Chase, Severe, Braunstein, and Does 1-5 in their individual capacities.

94. Elements of IIED: Under New Jersey law, to establish Intentional Infliction of Emotional Distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly to cause emotional distress; (2) the conduct was so extreme and outrageous in character and so

Docusign Envelope ID: 62EA097A-8E17-4F25-A856-582271DG1E5E

intolerable in a civilized society as to be regarded as utterly unacceptable; (3) the actions

proximately caused the emotional distress; and (4) the distress suffered is severe (not trivial

or transient). New Jersey follows the Restatement in requiring that the conduct "go beyond

all possible bounds of decency… and be regarded as atrocious, and utterly intolerable in a

civilized community." The emotional distress must be such that no reasonable person could

be expected to endure it (e.g., severe lasting psychological trauma).

95. Outrageous Conduct: Defendants' conduct, as detailed earlier, was extreme, outrageous, and

malicious. They conspired to wrongfully strip Plaintiff of his parental rights and reputation

by abusing legal process - effectively treating him as though he were an abuser without

giving him a chance to defend himself. They did so in a context (domestic violence

proceedings) where such an outcome carries enormous stigma and personal anguish.

Consider the perspective: Plaintiff, a father who had not been found (in a fair proceeding) to

have done wrong, was ambushed in court and publicly adjudicated as a violent threat,

without notice or opportunity to respond. Defendants orchestrated this knowing it would

likely result in an unjust FRO branding Plaintiff as an abuser, separating him from his child,

and tarnishing his name. Falsely portraying someone as a domestic abuser via a rigged

process is truly egregious and shocking conduct, especially when done by officers of the

court (lawyers and law faculty who are sworn to uphold justice). It is hard to imagine a more

outrageous misuse of power in a family law context - they leveraged the authority of the

courts to inflict maximum emotional pain on Plaintiff, all for litigation advantage.

Additionally, the betrayal of trust inherent in lawyers (and a law school clinic) subverting the

law in this manner contributes to the outrageousness. This was not a mere clerical error or a

Docusign Envelope ID: 62EA097A-8E17-4F25-A956-582871DG1E5E

close call; it was a deliberate scheme to cause Plaintiff grievous harm under the guise of

lawful process. New Jersey courts have found outrageousness in far less extreme scenarios

(for example, racial slurs by a superior, or mishandling of a loved one's corpse). Here, the

coordinated legal deceit, with foreseeably devastating consequences to Plaintiff's familial

bonds and mental well-being, meets and likely exceeds the threshold of outrageousness.

96. Intent or Recklessness: Defendants intended (or at least knew with substantial certainty) that

their actions would cause Plaintiff severe emotional distress. One cannot orchestrate the loss

of a person's child custody opportunity and the imposition of a stigmatizing restraining order

without expecting to cause extreme anguish. In fact, causing Plaintiff emotional pain appears

to have been part of the plan - it would weaken him as an adversary and vindicate their

client. Even if their primary goal was tactical, they at minimum acted in reckless disregard of

the near-certainty that Plaintiff would suffer extreme distress. The law does not require that

inflicting emotional harm be the sole purpose, only that it was a certain or highly likely result

that they consciously ignored. Here, it was certain (and indeed intended) that Plaintiff would

be devastated by losing his chance at a fair custody determination and being labeled a danger

unjustly.

97. Causation of Severe Emotional Distress: Defendants' actions were the direct and proximate

cause of Plaintiff's severe and continuing emotional distress. Prior to the events in question,

Plaintiff had no final restraining order against him and reasonably expected a fair

opportunity to seek custody of his children. As a result of Defendants' scheme, Plaintiff was

shocked and traumatized by the sudden outcome of the September 16, 2025 hearing. He

experienced (and continues to experience) symptoms consistent with severe emotional

distress: e.g., sleeplessness, anxiety attacks, feelings of humiliation and powerlessness, and deep depression over the injustice and the separation from his child. Being falsely adjudicated as a violent person has caused him extreme emotional anguish - he feels hopeless about the system and lives in fear of being arrested over minor technicalities of the FRO (since any contact can lead to criminal charges). He is constantly anxious that the court's false "findings" (procured by Defendants) will permanently damage his relationship with his child. The distress is far beyond what a reasonable person could endure: Plaintiff's fundamental identity as a father and as a law-abiding citizen was attacked and undermined by what happened. But for Defendants' outrageous conduct, none of this emotional trauma would have occurred - Plaintiff likely would have prevailed at a fair hearing (as he did on appeal the first time), and he would not be under an FRO or facing a skewed custody trial. Thus, the causal link is clear.

98. Severity of Distress: Plaintiff's emotional distress is severe by any measure. It is not mere transient upset or embarrassment; it is profound and ongoing suffering. He has essentially been living under a cloud of false guilt and has had to fight desperately to clear his name and regain normal access to his children. The law recognizes that wrongful interference with parental rights can cause devastating emotional harm. Indeed, New Jersey's allowance of bystander emotional distress claims (see Portee v. Jaffee, discussed below) reflects the high value placed on the parent-child relationship - here, Plaintiff was made to "witness" the effective legal loss of his child through a fraud on the court, an experience akin, emotionally, to having a child taken unjustly. Plaintiff's distress manifests in persistent psychological symptoms (including, as he will testify, trouble concentrating, nightmares, and a severe loss

Docusign Envelope ID: 62EA097A-8E17-4F25-A856-582271DG1E5E

of trust in the legal system that has affected his daily functioning). He may require therapy or counseling to cope with the aftermath. This plainly satisfies the requirement of severe emotional distress, which in New Jersey often means distress so substantial that no reasonable person should be expected to endure it.

99. Liability: Accordingly, Defendants are liable for intentional infliction of emotional distress. They engaged in extreme and outrageous conduct with the intent to cause (or reckless disregard of causing) Plaintiff severe distress, and their actions in fact caused such distress. Plaintiff seeks damages for his emotional pain and suffering. Given the malice involved, Plaintiff also seeks punitive damages on this Count to punish Defendants and deter similar misconduct. New Jersey law permits recovery of punitive damages for IIED where the conduct is especially egregious (as it is here).

100. Comparison to Analogous Cases: While each case is fact-specific, it is worth noting that New Jersey courts have upheld IIED claims in scenarios far less calculated than this. For example, in Taylor v. Metzger, 152 N.J. 490 (1998), a single racial slur by a sheriff to an employee was deemed potentially extreme and outrageous enough for a jury. In Buckley v. Trenton Saving Fund Soc., 111 N.J. 355 (1988), the Court noted that "the severity of the emotional distress raises questions of fact" typically. Here, the sustained campaign against Plaintiff's rights and peace of mind is far more egregious than an isolated insult or negligence. It is a sustained assault on his dignity and familial bonds, using the machinery of the courts. If anything meets the standard of IIED, this does.

101. Therefore, Plaintiff requests that the Court enter judgment in his favor on this Count and award appropriate compensatory and punitive damages. (This Count is pled in the alternative

to Count IX, which alleges Negligent Infliction of Emotional Distress, for the scenario that a fact-finder might somehow find Defendants did not intend to cause harm - though the evidence is expected to show intentional conduct. If the conduct were found merely reckless or negligent, Count IX would apply.).

**Count IX - Negligent Infliction of Emotional Distress (NIED) - in the Alternative**

102. Incorporation of Allegations: Plaintiff repeats all relevant allegations. This Count is pled in the alternative (to Count VIII) against the same Defendants (Chase, Severe, Braunstein, Does 1-5) to cover any finding that Defendants' conduct, while causing severe emotional harm, was not willful or wanton but was nevertheless negligent. (Plaintiff maintains the conduct was intentional; this claim is a fallback position.)

103. Direct vs. Bystander NIED: New Jersey law recognizes Negligent Infliction of Emotional Distress in two general scenarios: (1) the "bystander" scenario (outlined in Portee v. Jaffee, 84 N.J. 88 (1980)) where a plaintiff witnesses the death or serious injury of a close family member due to defendant's negligence and suffers emotional trauma, and (2) the "direct victim" scenario where a defendant's negligence is of a nature that is likely to cause serious emotional harm to the plaintiff even without physical impact (for example, mishandling of corpses, erroneous notification of a family member's death, or other breaches of duties that inherently carry emotional consequences). In either case, the emotional distress must be serious and foreseeable, and there must be a duty of care breached by defendant.

104. Here, Plaintiff is not a bystander to a physical accident; he is the direct victim of Defendants' negligent acts that struck at his emotional well-being. If, hypothetically, Defendants did not intend to cause harm but did negligently engage in the reckless procedural tactics described

(e.g., if one were to say they "mishandled" Plaintiff's legal rights out of incompetence rather than intent), then they still breached a duty of care owed to Plaintiff and it was highly foreseeable that severe emotional distress would result. All persons undertaking legal action owe a duty not to carelessly cause undue emotional harm through extreme rule violations, especially in a context involving familial relationships. Defendants - as legal professionals - certainly owed Plaintiff (as opposing party) at least a duty of reasonable care in following court procedures and not creating false findings against him through negligence. By negligently failing to ensure he was served, negligently overlooking his due process rights, and generally violating standard legal practices in a way that any reasonable professional would recognize as harmful, Defendants breached that duty.

105. Duty and Foreseeability: Aside from professional duties, there is a broader duty not to subject others to an unreasonable risk of emotional harm. The New Jersey Supreme Court has allowed recovery for emotional distress even absent physical injury when the defendant's negligence created a high likelihood of profound emotional trauma - e.g., hospital losing a corpse (Strachan v. John F. Kennedy Memorial Hosp.), or police negligently informing someone of a loved one's death. Here, Defendants' negligence (in this alternative framing) effectively deprived Plaintiff of his child and falsely maligned him. Few things are more likely to cause devastating emotional harm than erroneously being marked as a violent person and losing parenting time due to procedural negligence. It was entirely foreseeable that if Defendants botched the process (even if one imagines it botched rather than sabotaged) and caused a wrongful FRO to issue, Plaintiff would suffer extreme emotional distress, even if via PTSD of his last two years of agony. Basic human experience teaches

that being kept from one's child by a court order and being labeled abusively will cause serious grief and anguish.

106. Portee/Bystander Rule Note: The Portee criteria technically apply to someone who witnesses injury to another. While Plaintiff's situation is not a literal Portee claim (since he did not witness a physical accident befalling his child), it is analogous in the sense that he "witnessed" a legal injury to his relationship with his child. Portee requires: (1) death or serious physical injury of another caused by defendant's negligence; (2) a close familial relationship; (3) observation of the injury at the scene; (4) severe emotional distress. Translating that loosely here: Plaintiff essentially observed the legal system injure his parent-child relationship by negligently entering a false FRO. His bond with his child is a fundamental interest - akin to physical well-being in many respects. He was present at the "scene" (the courtroom) when this wrongful result happened. And he indeed suffers severe emotional distress as a result. While this is not a perfect Portee scenario (no physical injury to the child), New Jersey courts have, in other contexts, allowed direct victims to recover for emotional harm even absent physical impact when the negligence strikes at intimate personal interests. The public policy behind Portee - to compensate real and profound emotional trauma - and behind other NIED allowances (like for mishandling of a corpse) would support recovery here, given how deeply Plaintiff has been traumatized by Defendants' actions affecting his family.

107. Causation and Damages: If Defendants are found to have owed and breached a duty of care to Plaintiff through their mishandling of the case (even without malice), the same harm detailed in Count VIII has occurred. Plaintiff's severe emotional distress was caused by

Defendants' actions (intentional or not). The damages recoverable would likewise include compensation for his mental anguish, costs incurred, etc. The key difference in this Count is that no showing of intentional outrageous conduct is required - only negligence and foreseeable, severe emotional injury. Plaintiff asserts that even under this lesser standard, Defendants' liability is clear. They acted (at the very least) negligently by deviating from the standard of care in legal practice and court procedure, thereby causing Plaintiff foreseeable, serious emotional harm.

108. New Jersey has increasingly recognized that emotional well-being is entitled to protection from negligence in certain circumstances. Given the especially sensitive and devastating nature of the loss here (unjust interference with child custody), the Court should find a duty existed and was breached. See, e.g., Dela Cruz v. Borough of Hillsdale, 183 N.J. 149 (2005) (noting that whether a duty exists depends on foreseeability of harm and fairness of imposing a duty). It is fair to hold those who negligently derail custody rights accountable for the emotional damage they cause, just as we hold liable those who negligently inflict other personal harms.

109. Conclusion on NIED: Plaintiff prays that if, for any reason, the trier of fact does not find Defendants liable for intentional infliction of emotional distress, it will find them liable for negligent infliction of emotional distress. Under this Count, Plaintiff would be entitled at least to compensatory damages for his severe emotional suffering and related losses (though punitive damages would likely not apply to mere negligence). This alternate pleading ensures that Plaintiff can obtain some measure of justice for the emotional devastation he has endured, even under the most charitable interpretation of Defendants' conduct.

(Note: The inclusion of this Count should not be taken to dilute the seriousness of Defendants' misconduct - as pleaded, their actions were intentional. This is merely a protective pleading. In either event, the severity of Plaintiff's emotional distress is established, and he should recover for it.)

## Count X - Tortious Interference with Court-Ordered Parenting Time (Intentional Interference with Custodial Rights)

110. Incorporation of Allegations: Plaintiff repeats and incorporates all prior paragraphs. This Count is against Defendants Severe, Braunstein, Chase, and Does 1-5 in their individual capacities.

111. Protected Parental Interest: Plaintiff has a fundamental right to the care, custody, companionship, and management of his minor children - a right protected by the Constitution and recognized by state law. New Jersey public policy strongly favors frequent and continuing contact between children and both parents, absent a compelling reason to limit a parent's time (as codified in N.J.S.A. 9:2-4). At the time of Defendants' actions, Plaintiff was engaged in a matrimonial custody proceeding scheduled for December 9-10, 2025, in which custody and parenting time would be decided on the merits by the family court. Prior to the interference described, Plaintiff had a reasonable expectation of obtaining a fair custody determination (potentially joint or primary custody) based solely on the children's best interests and the normal factors (Plaintiff had been a devoted father without any valid finding of harm).

112. Defendants were well aware of Plaintiff's custody case and his parental stake. They knew that an unjust restraining order could skew or even effectively decide the custody outcome.

Thus, they knew Plaintiff's relationship with his children and his parental rights hung in the balance.

113. Nature of the Interference: Defendants intentionally interfered with Plaintiff's custodial rights and parenting time by unlawfully procuring the September 16, 2025 Final Restraining Order through fraud and procedural violations. Although that FRO did not explicitly strip Plaintiff of existing parenting time in the divorce case (which was ongoing), it was secured for the purpose of tilting and prejudicing the pending custody adjudication. Under New Jersey law and practice, the existence of a final domestic violence restraining order - especially one containing findings of abuse or "continuing danger" - is a material factor in custody determinations. Family courts routinely consider a parent with an FRO against them as a safety risk, often maintaining the status quo of limited contact and supervised exchanges, etc., as a result. Defendants understood this dynamic. In fact, influencing the custody case was a primary motive for their scheme: by getting an FRO on record, they armed the family court with a ready-made justification to grant primary custody to the other parent (their client) and to severely curtail Plaintiff's parenting time.

114. The engineered FRO thus functions as a present and ongoing interference with Plaintiff's parental rights. It immediately imposes a criminally enforceable no-contact regime between Plaintiff and the other parent (and indirectly affects communications about the children). It stigmatizes Plaintiff as a perpetrator of domestic abuse, which in custody contexts often leads to reduced or supervised visitation. Essentially, by fraudulent means, Defendants inserted a poisonous factor into the custody case that would not have existed but for their

actions. The FRO is a state-created barrier to Plaintiff's full exercise of custody and

parenting time, one that is only in place because of Defendants' wrongful acts.

115. **Same-Judge Predetermination:** The prejudice to Plaintiff's custody rights is magnified by the

fact that the same judge (Hon. Albert Rescinio) who presided over the FRO hearing is also

presiding over the divorce/custody trial. Defendants understood that by pulling off their

scheme in front of Judge Rescinio (who was new to the DV case but was the sitting family

judge on the custody case), they could "lock in" that judge's view of Plaintiff as an aggressor

before the custody trial even began. Indeed, they timed and executed the ambush in August-

September 2025 precisely to entrench a narrative: that Plaintiff is a dangerous individual

who had to be restrained again. Now, when the custody trial occurs, Judge Rescinio can

simply point to the recent FRO and its findings as justification to rule against Plaintiff on

custody, without giving Plaintiff a true de novo consideration. In effect, Defendants sought to

predetermine or at least heavily influence the custody outcome by fabricating a DV record to

be used against Plaintiff. This is a direct interference with the integrity of the custody

adjudication and, by extension, with Plaintiff's custodial rights.

116. **Unlawful Means:** Importantly, Defendants achieved this interference through unlawful and

improper means. Unlike, say, a parent who legitimately wins a restraining order by proving

abuse (which could lawfully affect custody), here the restraining order was obtained by

fraud, concealment, and violation of court rules. Defendants' conduct included: fraud on the

court (misleading the judge and suppressing material facts), violations of procedural rules

(non-service of pleadings, etc.), and collusive communications with court staff - all done to

procure the FRO unfairly. Using a fraudulently obtained FRO as leverage in a custody

dispute is not only unethical, it is unlawful in the sense that it violates public policy and possibly certain statutes (for instance, perjury or contempt if false evidence was sworn, etc.). New Jersey even criminalizes direct interference with custody via abduction or concealment (see N.J.S.A. 2C:13-4, Interference with Custody) - while Defendants did not physically abduct a child, their actions are morally on par: they concocted a legal pretext to separate a parent from his child. The law views such interference with extreme disfavor (2C:13-4 makes it a felony-level offense to take or conceal a child to deprive the other parent of custody or parenting time). That policy underscores how seriously this interference should be taken. Defendants' scheme, though carried out in court rather than by snatching a child, achieved a similar result - and they did it by corrupting legal processes, which is certainly "unlawful means." Thus, all elements of an intentional tortious interference are met: an existing or prospective right (Plaintiff's parenting time and custody prospects), defendant's knowledge of it, intentional interference, accomplished by wrongful means, causing injury.

117. Current Injury and Damages: The tainted FRO has already inflicted concrete harm on Plaintiff's parental relationship and opportunities. Specifically: (a) It places practical obstacles on co-parenting - Plaintiff cannot communicate directly with the other parent about routine child matters without risking violation (all communications must be through intermediaries or lawyers, imposing cost and delay). (b) It casts Plaintiff as a "continuing danger", which the family court is likely to heavily weigh against him at the custody trial. (c) It has a chilling effect - Plaintiff, under threat of arrest, must be overly cautious in even normal parenting tasks (for example, coordinating pickups via third parties, etc.), and this diminishes the quality and spontaneity of his parenting time, effectively reducing it. (d)

Perhaps most significantly, it deprives Plaintiff of a fair chance at an "even-playing-field" custody determination - the presence of the FRO tilts the scales before he even sets foot in court for the custody trial. But for Defendants' illicit actions, Plaintiff would be entering the December 2025 custody trial with no FRO against him and no cloud of being an adjudicated abuser, meaning the judge would have to evaluate both parents neutrally on legitimate best-interest factors. That chance has been stolen. If not corrected, Plaintiff stands to lose custody or receive a far lesser parenting arrangement than he otherwise would - a profound injury to his parental rights.

118. Plaintiff seeks both damages and equitable relief for this interference. In terms of damages, he asks to be compensated for the attorney fees and costs he is incurring to fight the FRO's use in the custody case (or to seek its vacatur), for the emotional anguish of this forced separation and stigma (some of which overlaps with IIED damages), and for any lost time with his children attributable to the FRO's constraints. He also seeks punitive damages against Defendants, as their conduct was willful, malicious, and shocks the conscience in a civilized society. Intentionally undermining a parent-child relationship through deceit is reprehensible and warrants punishment.

119. For equitable relief, Plaintiff specifically requests the Court to nullify or enjoin enforcement of the fraudulently obtained FRO as part of the remedy for this Count (if within the Court's power), or at least to issue declaratory relief that the FRO was procured unlawfully and cannot be used to prejudice Plaintiff's custody rights. This would help neutralize the ongoing interference. (This overlaps with the relief in Count XI - declaratory and injunctive relief -

which is addressed separately, but is mentioned here to underscore that stopping the
interference is as important as compensating it.)

120. Legal Basis: While "tortious interference with parenting time or custody" is not as
commonly labeled a tort as, say, abuse of process, the allegations here are actionable under
general tort principles. New Jersey courts recognize torts for interference with various rights
(contractual relations, prospective economic advantage, etc.), and have signaled that
interference with family relations can be actionable when done intentionally and wrongfully.
Notably, the abduction of a child from a parent has given rise to civil actions for interference
with custodial relations in some jurisdictions. Here, instead of physical abduction,
Defendants performed a judicial abduction. There is no reason a civil action should not lie
for this conduct. In fact, given that New Jersey criminal law (N.J.S.A. 2C:13-4) criminalizes
interference with custody, recognizing a parallel civil claim furthers the same policy - to
protect the parent-child relationship from unjust disturbance.

121. Therefore, Plaintiff urges that the Court recognize this claim and hold Defendants liable for
intentionally interfering with his custodial rights. The status of the FRO has already been
called into question by the Appellate Division once (vacating the first FRO), and its re-
obtainment via misconduct makes this a rare but compelling case for relief. Plaintiff should
not have to wait to appeal a second time in family court (an uncertain and prolonged process)
when this Court can grant relief now for the constitutional and tortious wrongs.

122. In sum, Plaintiff seeks: (1) compensatory and punitive damages as described; (2) an
injunction preventing Defendants (and those in concert with them) from using or
disseminating the September 16, 2025 FRO to influence the custody trial, and compelling

corrective measures to neutralize the prejudice (such as a declaration that the FRO is void or unreliable); and (3) any further relief the Court deems just to restore Plaintiff's fair opportunity to maintain his role in his children's lives.

(Renumbering Note: This Count was originally listed as "Count X" in the pleading. It is presented here as the intentional tort that encapsulates the injury to Plaintiff's parental relationship caused by Defendants' actions. Regardless of numbering, the substance remains as above.)

**Count XI - Declaratory Judgment and Injunctive Relief (28 U.S.C. §§ 2201-2202; Fed. R. Civ. P. 65)**

123. Incorporation of Allegations: Plaintiff repeats and incorporates all prior paragraphs as if fully set forth herein. This Count seeks equitable relief (declaratory and injunctive) in addition to the legal (monetary) relief sought in the preceding counts. It is brought against Rutgers University Law School and its officers in their official capacities, as well as any other Defendants as necessary to effectuate the relief (including those in active concert with them).

124. Nature of Relief Sought: Plaintiff requests that this Court issue a declaratory judgment stating that Defendants' conduct, as described in Counts I-X, was unlawful and unconstitutional. In particular, Plaintiff seeks declarations that: (a)the actions of Rutgers Law School's Domestic Violence Clinic (through its staff and students) in Plaintiff's case - including the failure to serve amended pleadings, the concealment of evidence, and the collusion with state actors - violated Plaintiff's procedural due process rights under the Fourteenth Amendment and also constituted tortious conduct under state law; (b) the continued enforcement of the Final Restraining Order obtained on September 16, 2025, as a

product of that unlawful conduct, is unconstitutional and unjust; (c) Rutgers Law School (as

an institution) maintained policies or customs that were the moving force behind these

violations (as detailed in Count III, the Monell claim). Such declarations will clarify the

rights and legal relations of the parties and establish an official record vindicating Plaintiff's

rights. This is crucial not only for Plaintiff's personal relief but also for potential collateral

use in state court (for example, to expunge or override the tainted FRO, and to inform the

state custody proceedings that the FRO was improperly obtained). A declaratory judgment

will serve the public interest by formally denouncing the wrongful conduct and guiding

Rutgers (and other actors) in the future.

125. Plaintiff also seeks a permanent injunction to prevent future recurrences of the type of

misconduct that occurred here. Plaintiff has a reasonable fear that without court-ordered

changes, Rutgers Law (or its clinic personnel) could engage in similar tactics again - either

against him (should there be further proceedings or enforcement related to the current FRO)

or against others in New Jersey family court. Moreover, the environment in Monmouth

County (evidenced by judges' apparent willingness to enable the collusion) might allow such

collusion to persist absent external intervention. Therefore, injunctive relief is warranted to

address these systemic issues. Specifically, Plaintiff asks for an injunction that includes, but

is not limited to, the following provisions (tailored as the Court deems proper):

• Prohibiting Rutgers Law's Domestic Violence Clinic (and its faculty, staff, students, or agents)

from participating in Plaintiff's family court or domestic violence matters unless and until

certain safeguards are in place - or perhaps suspending their participation in Monmouth

County DV cases for a period, if the Court finds that appropriate. The idea is to prevent those

who wronged Plaintiff from having any further opportunity to do so, at least until reforms are implemented.

• Requiring Rutgers Law to implement and enforce proper training and oversight for any clinic involvement in litigation, including training on due process obligations to opposing parties, ethical duties of candor, and strict adherence to court rules (such as service requirements). The injunction should outline specifics - for example: mandatory checklists or certifications of service for any filing by a clinic member; periodic review by a neutral supervisor (not directly involved in the case) to ensure compliance; documentation of all communications with court personnel with notice to opposing parties, etc.. Essentially, Rutgers Law must establish a robust compliance regime to prevent future abuses.

• Ordering Rutgers Law to establish a formal policy that any misconduct (like evidence suppression or rule violations) by clinic participants will lead to discipline, and to communicate this policy to all current clinic members. A top-down directive that due process for all parties is a priority and that cheating will not be tolerated should be instituted.

• If within the Court's power, enjoining the enforcement of the tainted September 16, 2025 FRO (effectively nullifying it) unless the State promptly provides a new, fair hearing. Plaintiff acknowledges that a federal court may ordinarily hesitate to intervene in a state order (Younger abstention or other comity concerns), but given the extraordinary circumstances of fraud and the ongoing violation of Plaintiff's rights, such relief is justified or can be crafted in a way (e.g., conditional relief) that respects state procedures. At minimum, the Court can enjoin Defendants (Rutgers and its agents) from using or relying on that FRO in any proceeding, and

enjoin them from opposing its vacatur in state court, etc. The goal is to ensure that the fruits of their misconduct do not continue to poison Plaintiff's life.

126. The requested injunction should be detailed enough to remedy the harm and prevent recurrence, yet flexible enough for the Court to enforce effectively. Plaintiff is prepared to work with the Court on specific terms (and understands the Court will tailor relief to what the evidence shows and jurisdiction allows). The ultimate aim is to restore Plaintiff's rights and deter Defendants and others from ever engaging in such behavior again.

127. Attorneys' Fees: As part of the equitable relief, Plaintiff also requests that, should he prevail, the Court award attorneys' fees (or pro se equivalent fees) pursuant to 42 U.S.C. § 1988 for the § 1983-related aspects of this case, as well as any applicable state law fee provisions, given that he will have vindicated important civil rights. Although Plaintiff is pro se, he has expended enormous time and resources, and fee-shifting would be equitable.

128. Conclusion: In summary, Plaintiff prays that this Court, after trial or appropriate hearing, enter a declaratory judgment that Defendants violated his rights as described, and issue a corresponding permanent injunction to ensure no further harm befalls Plaintiff (or similarly situated litigants) from such unconstitutional and tortious practices. Such relief is authorized by the Declaratory Judgment Act and Fed. R. Civ. P. 65, and is necessary here to supplement the money damages and provide full justice.

129. The Court's intervention will not only redress Plaintiff's individual grievances but also serve the public interest by upholding the rule of law in our courts. It will make clear that no law school clinic or attorney is above the rules of due process, and it will help restore faith in the

fairness of the system. Plaintiff respectfully asks for the Court's favorable judgment on all

counts, and for such other relief as the Court deems just and proper.

Respectfully submitted,

DocuSigned by:

*Anthony Calascione*    10/27/2025

864B6D0D5DED4A9...

Anthony R. Calascione, Plaintiff pro se

Dated: October 27, 2025

**docusign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 62EA097A-8E17-4FA5-A056-582271DC1F5E | | Status: Completed |
| Subject: Complete with Docusign: federal v rutgers.pdf | | |
| Source Envelope: | | |
| Document Pages: 66 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | Anthony Calascione |
| AutoNav: Enabled | | 3309 Jessica Circle |
| EnvelopeId Stamping: Enabled | | Freehold Township, NJ  07728 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | AnthonyCalascione@RhinoResearchLLC.com |
| | | IP Address: 2a09:bac3:70ba: |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Anthony Calascione | Location: DocuSign |
|     10/27/2025 10:16:51 AM | | |
| | AnthonyCalascione@RhinoResearchLLC.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Anthony Calascione | *Anthony Calascione* | Sent: 10/27/2025 10:17:10 AM |
| AnthonyCalascione@RhinoResearchLLC.com | 864B6D0D5DED4A9... | Viewed: 10/27/2025 10:17:16 AM |
| Managing Partner | | Signed: 10/27/2025 10:18:19 AM |
| RHINO Research L.L.C. | Signature Adoption: Pre-selected Style | Freeform Signing |
| Security Level: Email, Account Authentication (None) | Using IP Address: 2a09:bac3:70ba:2773::3ee:73 | |

**Electronic Record and Signature Disclosure:**
   Not Offered via Docusign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/27/2025 10:17:10 AM |
| Certified Delivered | Security Checked | 10/27/2025 10:17:16 AM |
| Signing Complete | Security Checked | 10/27/2025 10:18:19 AM |
| Completed | Security Checked | 10/27/2025 10:18:19 AM |

| Payment Events | Status | Timestamps |
|---|---|---|